FILED
May 29, 2026
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY: Christian Rodriguez
DEPUTY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **MICHAEL TAYLOR, KIMBERLY BERRY, and FONTANE BERRY,** *Plaintiffs*, | § | |
| **v.** | § | **CIVIL ACTION NO. 1:25-cv-622** |
| **SERGEANT SCOTT SEIBER, LIEUTENANT TIM STACK, OFFICER CODY PILGRIM, and OFFICER WENDY LOPEZ.** *Defendants.* | § | |

**PLAINTIFFS' FIRST AMENDED COMPALAINT**

Plaintiffs Michael Taylor, Kimberly Berry, and Fontane Berry ("Plaintiffs") bring forth this 42 U.S.C. § 1983 case against Defendants Sergeant Scott Seiber ("Seiber"), Lieutenant Tim Stack ("Stack"), Officer Cody Pilgrim ("Pilgrim"), and Officer Wendy Lopez ("Lopez") (collectively "Defendants" when including all Defendants, and "Defendant Officers" when exclusively referring to individual Officers collectively) because Defendant City of Lakeway's police officers used brutal excessive force against Plaintiffs while falsely arresting them.

## I. PARTIES

1. Plaintiff Michael Taylor ("Taylor") is a resident of Lakeway, Texas.

2. Plaintiff Kimberly Berry ("K. Berry") is a resident of Lakeway, Texas.

3. Plaintiff Fontane Berry ("F. Berry") is a resident of Lakeway, Texas.

4. Defendant Sergeant Scott Seiber is a police officer with the Lakeway Police Department and is sued in his individual capacity for compensatory and punitive damages. At all relevant times,

Sergeant Seiber was acting under color of law as a Lakeway Police Department officer. He has been served with process and has made an appearance.

5. Defendant Lieutenant Tim Stack is a police officer with the Lakeway Police Department and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Lieutenant Stack was acting under color of law as a Lakeway Police Department officer. He has been served with process and has made an appearance.

6. Defendant Officer Cody Pilgrim is a police officer formerly with the Lakeway Police Department and is sued in his individual capacity for compensatory and punitive damages. At all relevant times, Officer Pilgrim was acting under color of law as a Lakeway Police Department officer. He has been served with process and has made an appearance.

7. Defendant Officer Wendy Lopez is a police officer formerly with the Lakeway Police Department and is sued in her individual capacity for compensatory and punitive damages. At all relevant times, Officer Lopez was acting under color of law as a Lakeway Police Department officer. She has been served with process and has made an appearance.

## II. JURISDICTION AND VENUE

8. This Court has federal question jurisdiction over this 42 U.S.C. § 1983 action pursuant to 28 U.S.C. §§ 1331 and 1343.

9. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) as all relevant events occurred in this division and all Defendants reside in this state.

## III. FACTS

### A. Officer Stack Quickly Escalates a Traffic Stop into a Use of Excessive Force Against Taylor; He Does Not Record the Incident.

10. At about 7:30pm on May 2, 2023, Lieutenant Stack was engaged in a traffic stop with a driver who did not have her inspection sticker on her windshield.

11. The driver of that vehicle was a white woman who appeared to be in her 40s or 50s.

12. After deciding he would not give her a ticket, Stack smelled marijuana odor and asked the white female driver if she had any marijuana in her car. The driver denied having marijuana and Stack joked with the driver about the marijuana odor.

13. Stack then walked back to his vehicle and commented to his friend, who was on a ride-along, that the white female driver was a "total worker-bee woman," insinuating that she could not be the source of the marijuana scent based on her appearance and demeanor.

14. In effect, Stack was acknowledging that he allows stereotypes to dictate his policing.

15. Stack then walked back to the white female's vehicle, joked some more, and allowed the white driver to leave without writing a ticket.

16. At no point did Stack ask the driver to exit the car, search her car, or use force against her in any way.

17. The way Stack treated this white female driver differed wildly from the way he would treat Taylor, a Black teenager, only a few minutes later for what he claims was the same issue—marijuana odor without any marijuana found.

18. Within seconds of ending his traffic stop with the first driver, Stack saw Taylor driving past him, who allegedly honked at a car that was moving slowly. Stack entered his vehicle and followed Taylor with the intent to pull him over.

19. On information and belief, Stack's body camera did not record the interaction with Taylor.

20. No worn bodycam footage or patrol vehicle dashcam footage exists that shows Taylor driving, Stack following Taylor, or the violent interaction that took place next.

21. After Taylor realized that Officer Stack was following him, he pulled into the driveway of his girlfriend's mother's home.

22. Upon arriving at the residence, Stack parked his vehicle behind Taylor.

23. Taylor did not get out of the car, nor did he engage in any action that could reasonably be construed as threatening at any point during the interaction with Stack. Taylor rolled down his window to demonstrate that he was complying.

24. Stack exited his patrol vehicle, walked to Taylor's open driver-side window, and yelled at Taylor demanding to know why he had honked his horn earlier. At that time Lieutenant Stack said nothing about marijuana.

25. Taylor responded that he had done so in response to the other car moving very slowly. Stack asked Taylor for his license and registration.

26. LPD had pulled Taylor or his mother, K. Berry, over three times in the past two months for minor alleged offenses—a "defective license plate," speeding, and an expired vehicle registration—which resulted in one citation.

27. Taylor was frightened because of the previous interactions with LPD, so he called his mother, K. Berry, because he wanted someone else to hear the interaction.

28. Taylor's hands were visible the entire time he was in his vehicle, with his phone in his right hand and his left on the steering wheel. Officer Seiber arrived on the scene around this time.

29. Taylor's decision to call his mother angered Stack, who became hostile, yelling at Taylor and demanding that he exit the car.

30. Within seconds, Stack aggressively reached through Taylor's driver-side window and opened the door from the inside.

31. Stack did not give Taylor a chance to step out of the vehicle once the door was open. He instead violently grabbed Taylor's hand from the steering wheel, twisted it behind Taylor's back, and pulled Taylor out of the car with his seatbelt still attached.

32. Stack then used violent force to arrest Taylor, including kneeing him in the head and using an "elbow strike" on Taylor's ribs.

33. The blows from Stack were extremely painful, and Stack knew his actions would cause Taylor severe pain. That was the point.

34. After Stack kneed and elbowed Taylor while he was defenseless on the ground and offering no resistance, Stack handcuffed Taylor, stood him up, walked him back to the police car, and placed him in the back of the vehicle.

35. Seiber assisted in the arrest by providing backup to Stack as Stack arrested Taylor. He stood in between Stack and the individuals at the home who were watching the entire situation.

36. Taylor was not a plausible threat and did nothing provocative to justify Stack ripping him out of his car and kneeing and elbowing him.

37. Accordingly, Stack had no need to reach into Taylor's vehicle, pull him out of the vehicle, use violent force, or arrest Taylor at all.

38. Stack's use of force to violently drag Taylor out of his car was unnecessary and excessive, and he escalated it further by kneeing Taylor in the head and elbowing him in the ribs.

39. A mere three minutes passed between the time Stack was at the previous traffic stop talking to the other driver in another location and the time when Taylor was placed in the back of the police vehicle following Stack's violent assault.

40. In only three minutes, Stack:

- Heard Taylor honk his horn;
- Got in his police vehicle;

- Followed Taylor to the residence;
- Got out of his car;
- Asked Taylor why he honked;
- Concluded that he was going to use force;
- Reached into Taylor's window;
- Opened the door;
- Dragged Taylor out of the car;
- Violently assaulted Taylor;
- Handcuffed Taylor;
- Gained total compliance;
- Stood Taylor up; and
- Led Taylor back to the police vehicle.

41. Stack could have done any number of things besides immediately using force; he could have slowed down and attempted to reason with Taylor, but he did not.

42. Any reasonable law enforcement officer in Stack's position would know that this escalation and use of force without any credible threat is an excessive use of force that violates the Fourth and Fourteenth Amendments of the United States Constitution.

43. After the fact, Stack tried to justify his actions by alleging that he smelled marijuana, but that is not the reason he followed Taylor originally, nor did he mention it to Taylor during the stop.

44. Even if Stack had smelled marijuana, that would not have warranted the type of excessive force that Stack used because Taylor was not a threat and marijuana is not a threat.

45. Stack cannot present any reason why the purported odor of marijuana would justify the use of force because there is none. Stack was not in any danger and Taylor was not fleeing the scene or resisting Stack.

46. Additionally, just three minutes before he arrested Taylor, Stack had released a white female driver without searching her car or asking her to exit her vehicle, despite the same alleged offense—the smell of marijuana.

47. Accordingly, Stack cannot claim that his use of excessive force was warranted because of any alleged marijuana smell.

48. Taylor never offered any resistance to Stack. He simply sat in the driveway with his driver-side window down and talked to his mother on the phone for less than sixty seconds. The use of force was objectively unreasonable in that situation, as Taylor was not a threat.

### B. LPD Officers Escalate the Situation by Using Excessive Force Against and Arresting Taylor's Parents.

49. Shortly after Stack and Seiber arrested Taylor and placed him in the back of an LPD vehicle, Officers Pilgrim and Lopez arrived on the scene.

50. This brings the total number of LPD officers on the scene to five, all in response to a teenager who allegedly honked his horn and dared to call his mother when stopped.

51. Shortly after Taylor's arrest, his parents F. Berry and K. Berry arrived at the residence.

52. F. Berry and K. Berry, like Taylor, are Black.

53. Upon exiting their vehicle, F. Berry and K. Berry both walked over to Defendant Officers.

54. K. Berry began asking Defendant Officers questions like "why did you put your hands on my son?" and "where is my child?" while F. Berry was calmly recording on his phone.

55. K. Berry, too, was calm, though clearly concerned for her son's wellbeing.

56. K. Berry directed her questions mainly to Pilgrim, who was searching Taylor's car while the other Defendant Officers were spread out in the vicinity.

57. The officers told K. Berry that Taylor was in the back of the police car but refused to answer her other questions.

58. At that point, the Berrys were standing a safe distance away from Pilgrim—about fifteen feet.

59. Even though another officer was already safely searching Taylor's car, Pilgrim claimed that he could not safely search the car while the Berrys were standing within fifteen feet of him.

60. In fact, that Officer continued to search the car while Pilgrim aggressively confronted K. Berry and F. Berry.

61. Within just thirty seconds of the Berrys exiting their vehicle, Pilgrim quickly rushed up to them and began screaming at them to try to intimidate them to move further back.

62. As Pilgrim approached F. Berry, Pilgrim prevented him from clearly recording the interaction.

63. The Berrys remained calm as Pilgrim escalated the situation. They did not raise their voices or do anything that could be construed as a threat.

64. As Pilgrim approached the Berrys, while screaming at them, he further escalated the situation by grabbing F. Berrys right shoulder and arm, which were holding the phone he was using to record.

65. The Berrys had done nothing provocative or threatening to give Pilgrim reason to approach them, nor had F. Berry done anything that would give Pilgrim reason to grab him.

66. Pilgrim knew that approaching the Berrys and grabbing F. Berry would escalate the situation, just like any competent law enforcement officer would have, but he did it anyway.

67. In response to Pilgrim grabbing him, F. Berry told Pilgrim not to touch him.

68. Pilgrim again escalated the situation by telling F. Berry in response that "I'll put you in fucking cuffs."

69. F. Berry was not the one who escalated the situation, nor had he been accused of any illegal activity, yet Pilgrim threatened to arrest him.

70. At this point, F. Berry loudly told Pilgrim not to touch him. F. Berry was not physically resisting or posing any sort of threat; he was only using words.

71. Pilgrim did all of this in less than one minute after the Berrys arrived at the residence.

72. Stack was physically present and positioned directly behind F. Berry, close enough to observe Pilgrim's demeanor, body language, and conduct during this interaction.

73. Stack is a twenty-year law enforcement veteran.

74. Stack could observe Pilgrim's body language before Pilgrim placed his hands on F. Berry.

75. On information and believe, Stack observed Pilgrim in an agitated and aggressive state, as well as escalating the encounter without any legitimate law enforcement justification.

76. On information and belief, Stack was aware Pilgrim was about to initiate constitutionally excessive force against a man who had done nothing to warrant it.

77. Only five seconds after Pilgrim grabbed F. Berrys shoulder, Stack grabbed F. Berry's arm and pulled him to the ground.

78. In pulling F. Berry to the ground, Stack knew that he was going to cause F. Berry significant pain.

79. Lakeway Police Department's Policy imposed an affirmative duty on Stack to intervene to prevent a fellow officer from using excessive and unconstitutional force.

80. Stack had a realistic and reasonable opportunity to fulfill his duty to intervene to prevent unconstitutional force moments before Pilgrim first seized F. Berry.

81. Stack chose not to exercise that duty.

82. Though F. Berry was not resisting, the two officers incapacitated him by putting him in a headlock, and Officer Seiber eventually joined to further incapacitate F. Berry.

83. Stack held F. Berry's left arm in between his legs and pulled it in an unnatural direction.

84. Stack knew this would cause F. Berry significant pain, and it caused severe damage in F. Berry's shoulder.

85. Pilgrim appeared to take glee in escalating the situation and then using excessive force, gloating to F. Berry as he was pinned to the ground, "who's in a headlock, boy?"—a comment displaying obvious racial animus.

86. Once the three officers violently forced F. Berry to the ground, Pilgrim and Stack placed him in handcuffs.

87. One officer—it is unclear who—then said to F. Berry "you're going to jail for assault on a PO." F. Berry never assaulted any of the officers and was not even charged with assault.

88. The LPD Officers did all of this because F. Berry was calmly recording them, putting up nothing that could be construed as active resistance.

89. F. Berry was holding his phone in one hand and had his other hand in his pocket the entire time until Stack grabbed him and pulled him to the ground.

90. At no point did any Defendant Officer attempt to de-escalate the situation.

91. There was no need to grab or arrest F. Berry in the first place. Pilgrim could have engaged F. Berry in conversation to attempt to resolve the situation before resorting to force, seizure, and arrest.

92. Pilgrim could have waited longer than thirty seconds to approach the Berrys and grab F. Berry, and Stack could have attempted de-escalation techniques instead of using excessive force on F. Berry once Pilgrim had grabbed him.

93. Instead, Pilgrim and Stack turned a nonviolent situation into a violent arrest that used excessive force.

94. Pilgrim continued to mock F. Berry as the other LPD Officers led him toward the police car, making comments like “you were the one on the ground, baby.”

95. Officer Pilgrim further tried to increase the unjustified charges on F. Berry by telling him he would charge him with failure to identify despite F. Berry not being able to show identification because he was in handcuffs.

96. Pilgrim, Seiber, and Stack then placed F. Berry in a second set of handcuffs, adding further discomfort, and placed him in the back of a police vehicle.

97. Meanwhile, LPD Officer Lopez arrested K. Berry without any probable cause and placed K. Berry in the back of a different police vehicle than F. Berry.

98. Following the Defendant Officers’ decision to arrest all three Plaintiffs, the Defendant Officers tried to figure out what to charge them with.

99. The Defendant Officers only decided the charges after trying to develop a story of why they arrested all three.

100. The Defendant Officers did not know what the charges originally should be because they were not arresting the Berrys for any legitimate crimes or even suspected crimes, but for asking questions and recording the police.

101. Pilgrim clearly had the intention of arresting F. Berry as a retaliatory measure and not because of any probable cause, as he told F. Berry “I’ll put you in fucking cuffs” before escalating the situation.

102. Pilgrim also said, about K. Berry, “she’s going to jail too,” but had no explanation as to why.

103. Clearly, Pilgrim needed some sort of post-hoc rationalization for why he arrested Plaintiffs, which is why he schemed with at least two other officers afterwards to come up with charges.

104. Defendant Officers had no probable cause to arrest any of Plaintiffs.

**C. LPD Ratifies Officer Defendants' Behavior, Maintaining Policies Which Violate the Constitution.**

105. Seiber, who was the highest-ranking officer at the scene, felt that the actions of the Defendant Officers complied with LPD policy and that nothing that occurred was alarming nor to the level that it warranted informing the chain of command.

106. The City of Lakeway's policymaker for all matters related to the activities of the Lakeway Police Department at all times relevant to this Complaint was LPD Chief Glen Koen.

107. On information and belief, some of Defendant Officers have a history of failing to deescalate, leading to their use of excessive force.

108. On information and belief, LPD Officers have a history of using excessive force in situations that do not warrant it.

109. On information and belief, LPD officers, including Defendant Officers, were never properly trained in de-escalation techniques.

110. On information and belief, LPD maintains an unofficial custom or practice of arresting individuals without probable cause and subsequently fabricating justifications after the fact to conceal unlawful arrests, as demonstrated by Pilgrim and the Defendant Officers' post-hoc rationalization of charges against Plaintiffs.

111. On information and belief, LPD has an unofficial custom or practice of retaliating against individuals who exercise their First Amendment right to record police activity.

112. On information and belief, LPD failed to train or supervise its officers to respect citizens' constitutional right to record police interactions, directly leading to the retaliatory arrest of F. Berry.

113. On information and belief, the City of Lakeway and Chief Koen knew about this history of LPD officers (1) failing to de-escalate; (2) using excessive force; and (3) retaliating against citizens for exercising their First Amendment right to record police activity.

114. For example, a citizen of Lakeway previously filed a complaint with Lakeway stating that Officer Pilgrim tried to instill fear in him and placed the entire neighborhood in fear.

115. The complainant said that Officer Pilgrim did not remotely attempt to de-escalate the situation.

116. On information and belief, LPD and Chief Koen also had knowledge of another incident in which Officer Pilgrim told a driver he had pulled over that he was "about to lose [his] shit," slamming his car door and the hood of his car in plain view of the driver.

117. The City of Lakeway was thus aware of Officer Pilgrim's frequent failure to deescalate situations and his penchant for intimidating citizens of Lakeway, yet they still kept him on the force.

118. LPD supervisors, including Chief Koen, reviewed Stack and Pilgrim's conduct with regard to Plaintiffs.

119. LPD found that Stack had followed all LPD policies, both with respect to de-escalation and use of force against Taylor and F. Berry, and took no action.

120. LPD made this determination in spite of Stack's recorded violent takedown of F. Berry without F. Berry resisting at all.

121. LPD found that Pilgrim had failed to de-escalate the situation properly, but it still found that his use of force F. Berry complied with LPD policy.

122. The City of Lakeway, through LPD and Chief Koen, approved of all of Stack's conduct and they approved of Pilgrim's use of force. Though Pilgrim was reprimanded regarding this incident, no action was taken at all against Stack, Lopez, or Seiber.

123. Thus, the City of Lakeway, through LPD and Chief Koen, ratified Stack, Pilgrim, Lopez, and Seiber's conduct with regard to Plaintiffs, making that conduct the de facto policy of the City of Lakeway.

124. As a result of Chief Koen's failure to adequately supervise and train them, all four Defendant Officers, who are/were Koen's subordinates, violated Plaintiffs' constitutional rights.

125. Chief Koen specifically failed to train the officers regarding their obligations (1) to not use excessive force; (2) to de-escalate tensions in situations where individuals are remaining calm to reduce the need for the use of force; and (3) to not interfere with First Amendment speech rights when peaceful bystanders are recording police.

126. Thus, the City of Lakeway had or ratified the following policies and/or practices when the Defendant Officers assaulted and arrested the Plaintiffs in this case:

- A pattern, practice, or custom of officers using excessive and illegal force against individuals posing no plausible threat;
- A pattern, practice, or custom of officers failing to de-escalate tensions, and instead escalating tensions, in situations where individuals are remaining calm;
- Failing to train officers on proper de-escalation tactics;
- A pattern, practice, or custom of officers failing to respect peaceful bystanders' First Amendment speech rights to record the police.

127. Chief Koen also failed to supervise the Defendant Officers to ensure they followed the above-mentioned obligations and the other above-delineated policies, all of which caused the violation of Plaintiffs' constitutional rights.

128. Chief Koen was deliberately indifferent to the known and obvious consequences of these policies, practices, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them.

129. Chief Koen was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference.

130. Chief Koen was aware of the pattern of similar incidents that occurred before and after the Defendant Officers violated Plaintiffs' constitutional rights, although it was also apparent and obvious that a constitutional violation was a highly predictable consequence of the City of Lakeway's above-delineated policies.

131. For example, Chief Koen knew about Pilgrim's history of failing to de-escalate situations but he never removed Pilgrim from the force or even reprimanded him prior to his actions in this incident.

132. Chief Koen was specifically aware that his officers had violated the Constitution by failing to comply with their obligations in the incidents discussed in this Complaint, as well as in other incidents, and that no additional procedures, policies, training, or practices had been implemented that would resolve this ongoing risk of constitutional harm to citizens.

133. Likewise, Chief Koen knew or should have known that failing to train his officers on the above-mentioned obligations was a particular omission in the City of Lakeway's training program that would cause City of Lakeway employees to violate the constitutional rights of members of the public they encountered, like the Plaintiffs.

134. Nevertheless, though Chief Koen knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

**D. LPD's Illegal Actions Destroyed the Berry Family's Lives.**

135. Defendant Officers arrested Plaintiffs and forced them to spend the night in jail.

136. 129. LPD charged Plaintiffs with criminal offenses. Taylor was charged with resisting arrest; K. Berry was charged with impeding an investigation; and F. Berry was charged with resisting arrest and impeding an investigation.

137. Notably, LPD did not charge Taylor with any marijuana-related offenses in relation to the May 2, 2023 incident.

138. The criminal charges do not relate to any substantive underlying criminal activity, only that LPD needed to charge the Plaintiffs with something in order to save face.

139. None of the charges reflect what really happened, which is that LPD officers escalated the situation by using violence without any need to do so, both with Taylor and with the Berrys.

140. All three Plaintiffs remained calm in the face of significant force by LPD Officers who had not received proper training on de-escalation techniques.

141. In both situations where excessive force was used—by not just one, but multiple officers— the excessive force was applied less than one minute after an officer's command and resulted in serious injury.

142. All three Plaintiffs were forced to retain a criminal defense attorney to fight these baseless charges.

143. The charges were all dismissed by the prosecutor's office.

144. In addition to the stress and humiliation of spending the night in jail and facing criminal charges, the Berrys suffered in other ways.

145. F. Berry suffered from a torn meniscus in his knee, a torn rotator cuff in his shoulder, and significant back pain. He required two surgeries to repair his rotator cuff, which he received in summer 2023, and he had to receive physical therapy as well.

146. These surgeries and the related recovery time made it impossible for F. Berry to return to his job as a mailman to this day.

147. Additionally, the physical and mental pain that F. Berry suffered caused severe depression, anxiety, and PTSD.

148. Taylor suffered from a swollen face, as well as neck and back pain.

149. Similar to F. Berry, Taylor also suffered severe depression and anxiety because of the incident.

150. Taylor drove for various food delivery service companies, and he always tried to avoid working in Lakeway after this incident, which negatively affected the jobs he could take and forced him to incur additional gas expenses to travel further distances.

151. K. Berry had to reduce her work hours to take care of the physically incapacitated F. Berry and her children.

152. Additionally, at least three jobs rejected her application because of the pending charges between May and October 2023; even Uber would not hire her because of the charges.

153. LPD's unlawful actions continue to affect the Berry family to this day.

## IV. CAUSES OF ACTION

### A. Fourth and Fourteenth Amendment Excessive Force (Plaintiff Taylor Against Defendant Lieutenant Stack)

154. Defendant Lieutenant Stack, while acting under color of law, brutally ripped Taylor out of his vehicle and violently assaulted him despite Taylor posing no threat.

155. Stack's use of force was wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, and directly caused Taylor to suffer injuries.

156. Therefore, Stack's actions violated Taylor's clearly established Fourth Amendment right to be free from excessive force and unreasonable seizure.

157. As a direct and proximate result of Stack's actions, Taylor suffered and continues to suffer significant injuries.

### B. Fourth and Fourteenth Amendment Excessive Force (Plaintiff F. Berry Against Defendants Lieutenant Stack, Sergeant Seiber and Officer Pilgrim)

158. Defendants Lieutenant Stack and Officer Pilgrim, while acting under color of law, approached F. Berry when he was calm and posed no threat, escalated the situation by grabbing him, and then violently assaulted him.

159. Stack and Pilgrim's use of force was wholly excessive to any conceivable need, objectively unreasonable in light of clearly established law, and directly caused F. Berry to suffer injuries.

160. Therefore, Stack and Pilgrim's actions violated F. Berrys clearly established Fourth Amendment right to be free from excessive force and unreasonable seizure.

161. As a direct and proximate result of Stack and Pilgrim's actions, F. Berry suffered and continues to suffer significant injuries.

### C. Fourth and Fourteenth Amendment False Arrest (Plaintiff Taylor Against Defendants Sergeant Seiber and Lieutenant Stack)

162. Defendants Sergeant Seiber and Lieutenant Stack, under color of law, caused Taylor to be arrested for resisting arrest, even though they knew, as any reasonable officer in their position would have known, that they lacked probable cause to make such an arrest.

163. Seiber and Stack's illegal decision to arrest Taylor without probable cause was not supported by the law or the evidence, which failed to establish probable cause.

164. Seiber and Stack's conduct was objectively unreasonable, violated Taylor's clearly established right to be free from false arrest, and proximately caused Taylor to suffer damages.

165. Accordingly, Seiber and Stack are liable to Taylor for compensatory and punitive damages under 42 U.S.C. § 1983.

### D. Fourth and Fourteenth Amendment False Arrest (Plaintiff F. Berry Against Defendants Officer Pilgrim, Sergeant Seiber, and Lieutenant Stack)

166. Defendants Officer Pilgrim and Lieutenant Stack, under color of law, caused F. Berry to be arrested for resisting arrest and impeding an investigation, even though they knew, as any reasonable officer in their position would have known, that they lacked probable cause to make such an arrest.

167. Pilgrim and Stack's illegal decision to arrest F. Berry without probable cause was not supported by the law or the evidence, which failed to establish probable cause.

168. Pilgrim and Stack's conduct was objectively unreasonable, violated F. Berry's clearly established right to be free from false arrest, and proximately caused F. Berry to suffer damages.

169. Accordingly, Defendants Officer Pilgrim and Lieutenant Stack are liable to F. Berry for compensatory and punitive damages under 42 U.S.C. § 1983.

### E. Fourth and Fourteenth Amendment False Arrest (Plaintiff K. Berry Against Defendant Officer Lopez)

170. Defendant Officer Lopez, under color of law, caused K. Berry to be arrested for impeding an investigation, even though she knew, as any reasonable officer in her position would have known, that she lacked probable cause to make such an arrest.

171. Lopez's illegal decision to arrest K. Berry without probable cause was not supported by the law or the evidence, which failed to establish probable cause.

172. Lopez's conduct was objectively unreasonable, violated K. Berry's clearly established right to be free from false arrest, and proximately caused K. Berry to suffer damages.

173. Accordingly, Lopez is liable to K. Berry for compensatory and punitive damages under 42 U.S.C. § 1983.

### F. First Amendment Retaliation (Plaintiff F. Berry Against Defendants Lieutenant Stack and Officer Pilgrim)

174. The First Amendment's protections of speech prohibit agents of the government from subjecting an individual, like F. Berry, to retaliation for engaging in protected speech.

175. F. Berry exercised his free speech rights by recording LPD Officers after they arrested his son.

176. Defendants Stack and Pilgrim retaliated against F. Berry for recording them, by attempting to intimidate F. Berry and then using excessive force against him.

177. But for F. Berry exercising his right to free speech, Stack and Pilgrim would not have thrown him to the ground, arrested him, and severely injured him.

178. Stack and Pilgrim's conduct was objectively unreasonable, violated F. Berry's clearly established right to be free from retaliation for exercising his First Amendment rights, and proximately caused F. Berry to suffer damages.

179. Accordingly, Stack and Pilgrim are liable to F. Berry for compensatory and punitive damages under 42 U.S.C. § 1983.

### G. 42 U.S.C. § 1983 – Failure to Intervene / Bystander Liability (Plaintiff Taylor Against Defendant Sergeant Seiber)

180. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

181. At all relevant times, Defendant Sergeant Seiber was acting under color of state law as a Lakeway Police Department officer.

182. Defendant Lieutenant Stack used objectively unreasonable and excessive force against Plaintiff Taylor in violation of the Fourth and Fourteenth Amendments, including by forcibly dragging Taylor from his vehicle, kneeing him in the head, and striking him in the ribs while Taylor was not resisting and posed no credible threat.

183. Defendant Seiber was present at the scene and physically positioned himself between Stack and the bystanders at the residence while Stack used excessive force against Taylor. Seiber arrived on the scene during the interaction between Stack and Taylor and observed, or had reason to know, that Stack was using constitutionally excessive force against a non-resisting teenager.

184. As the highest-ranking officer on the scene, Seiber had both the authority and the affirmative duty to intervene and stop Stack's use of excessive force. Seiber had a realistic and reasonable opportunity to intervene to prevent or mitigate the harm to Taylor but failed to take any steps to do so.

185. Seiber's failure to intervene was objectively unreasonable and constituted deliberate indifference to Taylor's clearly established Fourth Amendment right to be free from excessive force. His failure to act was a proximate cause of Taylor's injuries and damages.

186. As a direct and proximate result of Seiber's failure to intervene, Plaintiff Taylor suffered and continues to suffer bodily injury, physical pain and suffering, mental anguish and emotional

distress, medical expenses, humiliation, loss of enjoyment of life, and other compensable damages. Accordingly, Seiber is liable to Taylor for compensatory and punitive damages under 42 U.S.C. § 1983, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### H. 42 U.S.C. § 1983 – Failure to Intervene / Bystander Liability (Plaintiff F. Berry Against Defendant Lieutenant Stack)

187. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

188. At all relevant times, Defendant Lieutenant Stack was acting under color state law as a Lakeway Police Department officer.

189. Defendant Officer Pilgrim used objectively unreasonable and excessive force against F. Berry in violation of the Fourth and Fourteenth Amendments, including by approaching F. Berry without lawful justification, seizing him without probable cause, and initiating a violent physical confrontation against a non-resisting man standing on his own property.

190. Lieutenant Stack was physically present throughout the escalating confrontation and observed Pilgrim's conduct in real time. As a twenty-year law enforcement veteran, Stack knew, before Pilgrim first placed his hands on F. Berry, that Pilgrim was emotionally dysregulated, that Pilgrim's conduct lacked any legitimate law enforcement justification, and that Pilgrim was about to use constitutionally excessive force against F. Berry.

191. Stack had a realistic and reasonable opportunity to intervene and prevent the constitutional violation before it occurred. LPD Policy imposed an affirmative duty on Stack to exercise that opportunity. Stack chose not to act, and instead waited until Pilgrim had already seized F. Berry before joining the physical confrontation as a direct participant.

192. Stack's failure to intervene before force was applied was objectively unreasonable and constituted deliberate indifference to F. Berry's clearly established Fourth Amendment right to be free from excessive force. His failure to act was a direct and proximate cause of F. Berry's injuries,

including the rotator cuff tear requiring two surgeries, the torn meniscus, the back injuries, and the permanent impairment that ended his career as a mail carrier.

193. As a direct and proximate result of Stack's failure to intervene, Plaintiff F. Berry suffered and continues to suffer the injuries and damages described herein. Accordingly, Stack is liable to F. Berry for compensatory and punitive damages under 42 U.S.C. § 1983, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

### I. 42 U.S.C. § 1983 – Failure to Intervene / Bystander Liability (Plaintiff F. Berry Against Defendant Officer Lopez)

194. Plaintiffs incorporate all preceding paragraphs as if fully set forth herein.

195. At all relevant times, Defendant Officer Lopez was acting under color of state law as a Lakeway Police Department officer.

196. Defendants Lieutenant Stack, Sergeant Seiber, and Officer Pilgrim used objectively unreasonable and excessive force against Plaintiff F. Berry in violation of the Fourth and Fourteenth Amendments, including by grabbing him, violently pulling him to the ground, placing him in a headlock, and wrenching his arm while F. Berry was not resisting and posed no credible threat.

197. Officer Lopez arrived on the scene and was present as multiple Defendant Officers subjected F. Berry to a prolonged use of force—grabbing him, taking him to the ground, placing him in a headlock, and forcibly twisting his arm. Lopez observed, or had reason to know, that the force being used against the non-resisting F. Berry was constitutionally excessive.

198. Lopez had a realistic and reasonable opportunity to intervene to prevent or mitigate the harm to F. Berry during this prolonged use of force but failed to take any reasonable steps to do so. Rather than intervening, Lopez proceeded to arrest K. Berry without probable cause, while leaving F. Berry to suffer the ongoing assault.

199. Lopez's failure to intervene was objectively unreasonable and constituted deliberate indifference to F. Berry's clearly established Fourth Amendment right to be free from excessive force. Her failure to act was a proximate cause of F. Berry's injuries and damages.

200. As a direct and proximate result of Lopez's failure to intervene, Plaintiff F. Berry suffered and continues to suffer bodily injury, including a torn rotator cuff requiring two surgeries, a torn meniscus, and significant back pain; physical pain and suffering; mental anguish, emotional distress, severe depression, anxiety, and PTSD; medical expenses; loss of wages and loss of earning capacity; impairment; humiliation; and other compensable damages. Accordingly, Lopez is liable to F. Berry for compensatory and punitive damages under 42 U.S.C. § 1983, as well as attorneys' fees and costs pursuant to 42 U.S.C. § 1988.

## V. DAMAGES

201. Each Plaintiff seeks the following damages:

a) Past and future lost wages and loss of earning capacity;

b) Past and future physical pain;

c) Past and future mental anguish;

d) Past and future impairment;

e) Past and future disfigurement;

f) Past and future medical expenses;

g) Attorneys' fees, including costs, expert fees, and attorneys' fees pursuant to 42 U.S.C. § 1988;

h) Past and future damages for injury to Plaintiffs' character and reputation;

i) Pre-judgment and post-judgment interest at the highest rates allowable under the law;

j) All other compensatory and/or general damages to which Plaintiffs are entitled under state or federal law; and,

k) Punitive damages in the highest amount allowed by law against Defendants Stack, Pilgrim, Seiber, and Lopez only.

202. As a direct result of Defendants' unconstitutional conduct, Plaintiff Fontane Berry suffered severe and permanent physical injuries, including a torn rotator cuff requiring two surgeries, a torn meniscus, and chronic back pain. These injuries have rendered F. Berry unable to continue his career as a United States Postal Service mail carrier, a position he held for years prior to this incident, and have permanently impaired his physical capacity and ability to earn a living. F. Berry specifically seeks the following damages:

l) Past and future medical expenses, including the costs of two surgeries for his torn rotator cuff and torn meniscus, ongoing physical therapy, and any future medical treatment necessitated by his injuries;

m) Past and future lost wages and loss of earning capacity, including all wages, benefits, and career earnings lost as a result of his inability to continue his employment as a mail carrier;

n) Past and future physical pain and suffering arising from his torn rotator cuff, torn meniscus, back injuries, and the physical trauma inflicted upon him by Defendants;

o) Past and future permanent physical impairment and disfigurement, including the lasting functional limitations resulting from his surgeries and ongoing physical injuries;

p) Past and future mental anguish, emotional distress, severe depression, anxiety, and post-traumatic stress disorder resulting from the violent and humiliating treatment he suffered at the hands of Defendants; and

q) Past and future loss of enjoyment of life and damage to his character and reputation.

## VI. JURY DEMAND

203. Plaintiffs respectfully request a trial by jury.

## VII. PRAYER FOR RELIEF

204. To right this grave injustice, Plaintiffs request that the Court award them:

a) Past and future lost wages and loss of earning capacity;

b) Past and future physical pain;

c) Past and future mental anguish;

d) Past and future impairment;

e) Past and future disfigurement;

f) Past and future medical expenses;

g) Attorneys' fees, including costs, expert fees, and attorneys' fees pursuant to 42 U.S.C. § 1988;

h) Past and future damages for injury to Plaintiffs' character and reputation;

i) Pre-judgment and post-judgment interest at the highest rates allowable under the law;

j) All other compensatory and/or general damages to which Plaintiffs are entitled under state or federal law;

k) Punitive damages in the highest amount allowed by law against Defendants Stack, Pilgrim, Seiber, Lopez only;

l) An official written apology from all Officers involved, Chief Koen, and the City of Lakeway;

m) Declaratory relief that a violation of Plaintiffs' civil rights occurred by all Defendants; and

n) Award and grant such other just relief as the Court deems proper.

Respectfully submitted,

**KAPLAN LAW FIRM, PLLC**
2901 Bee Cave Rd, Suite G
Austin, Texas 78746
P: (512) 943-2761 | F: (512) 692-2799

*/s/Andrew Eckhous*
Austin Kaplan
Texas Bar No. 24072176
akaplan@kaplanlawatx.com
Andrew Eckhous
Texas Bar No. 24127926
aeckhous@kaplanlawatx.com
Caitlin Boehne
Texas Bar No. 24075815
cboehne@kaplanlawatx.com
Gabriel Loya
Texas Bar No. 24141905
gloya@kaplanlawatx.com

**ATTORNEYS FOR PLAINTIFFS**